UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

REPORT AND RECOMMENDATION

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

Drummond American LLC,

        Plaintiff,

  vs.

Share Corporation, and
Michael C. Ross,

        Defendants.        Civ. No. 08-5077 (JRT/RLE)

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## I.  Introduction

This matter came before the undersigned United States Magistrate Judge pursuant to a special assignment, made in accordance with the provisions of Title 28 U.S.C. §636(b)(1)(B), upon the Motion of the Plaintiff Drummond American LLC ("Drummond") for Partial Summary Judgment.  A Hearing on the Motion was conducted, at which time, Drummond appeared by Kerry L. Middleton, Esq., and the Defendants appeared by Brian Turner, Esq.  For reasons which follow, we recommend that the Plaintiff's Motion for Partial Summary Judgment be denied.

## II.  Factual and Procedural Background

Drummond brings this action against the Defendants Michael C. Ross ("Ross"), who is a former Drummond employee, and Share Corporation ("Share"), in which Drummond asserts claims arising out of Ross's resignation from his position as a Sales Agent for Drummond, and his subsequent employment by Share, which is a direct competitor of Drummond.  Specifically, Drummond alleges claims for breach of contract against Ross (Count I), misappropriation of trade secrets against the Defendants jointly (Count II), tortious interference with a prospective economic advantage against the Defendants jointly (Count III), tortious interference with a contract against Share (Count IV), and unfair competition against the Defendants jointly (Count V).  See, Amended Complaint, Docket No. 29, at ¶¶38-71. Additionally, Drummond seeks injunctive relief (Count VII), and an accounting (Count VI).  Id. at ¶¶72-78.

This matter is now before the Court upon Drummond's Motion for Partial Summary Judgment with respect to Counts I and IV. See, Docket No. 51. Drummond argues that it is entitled to Summary Judgment on those Counts, because it is undisputed that Ross's contract with Drummond is enforceable, that Ross breached the contract, and that Share tortiously interfered with Drummond's contract with Ross.

See, Plaintiff's Memorandum in Support, Docket No. 53, at pp. 1-2 of 21. The

Defendants contend that genuine issues of material fact remain and, as a consequence,

that Drummond is not entitled to Summary Judgment on Counts I and IV of its

Complaint. The facts pertinent to the Motion before us may be briefly summarized.


Drummond is engaged in the sale and distribution of chemical, industrial, and

hardware supplies, throughout Minnesota, North Dakota, and the United States. See,

Affidavit of Tom Gawne, ("Gawne Aff."), Docket No. 54-1, Exhibit A to Affidavit

of Joseph David Weiner ("Weiner Aff."), ¶2. Drummond's products include various

cleaners, maintenance products, hardware, and tools. Id. Drummond, which is a

wholly owned subsidiary of Lawson Products, Inc. ("Lawson"), sells its products and

services to its customers through independent Sales Agents, who solicit orders from

Drummond's customers, and who are the primary point of contact between

Drummond and its customers. Id. at ¶3. According to Tom Gawne ("Gawne"), who

is the Director of Product Management-Chemicals at Lawson, the chemical and

hardware sales business "is an extremely competitive business, and the personal

relationships between sales agent and customer is a critical component of a successful

sales process." Id. at ¶12.

Share "competes directly with Drummond, selling substantially similar products within the same service and marketing areas as Drummond." Id. at ¶10; see also, Deposition of John Wright ("Wright Depo."), Docket No. 54-5 (Exhibit E to Weiner Aff.), at p. 12 of 18. Drummond's business model requires frequent personal contact between its Sales Agents and its customers, and accordingly, Drummond invests considerable time, expense, and resources, in the training of its Sales Agents. See, Gawne Aff. at ¶4. Gawne avers that Drummond has also invested considerable resources in building its reputation, image, and relationship, with its customers and other business contacts and, as a result, that it has "established a valuable and substantial reputation, trade and patronage." Id. at ¶5.

Gawne attests that, through these efforts, Drummond's Sales Agents "gain detailed and intimate knowledge of Drummond's trade secrets, confidential and proprietary information, customers, and the needs, preferences, and dislikes of such customers." Id. at ¶6. According to Gawne, Drummond's trade secrets, confidential information, and customer relationships, have significant economic value, and as a result, Drummond has an interest in protecting this confidential information from being disclosed to competitors. Id. Gawne further advises that, as a standard practice, Drummond's Sales Agents are required to sign a contract entitled "Agreement with

Independent Sales Agent," in which Sales Agents agree to refrain from disclosing Drummond's confidential information, and to refrain from soliciting the customers they called upon, while at Drummond, in the event that their employment with Drummond terminates. <u>Id.</u> at ¶7; <u>Agreement With Independent Sales Agent, Docket No. 54-3, (Exhibit C to Weiner Aff.)</u>.

In 2002, Lawson hired Ross to work as a salesperson in a position that required him to sell chemicals and hardware. See, <u>Deposition of Michael C. Ross ("Ross Depo."), Docket No. 54-2 (Exhibit B to Weiner Aff.)</u>, at pp. 4-6 of 65. Ross initially believed that he would have an exclusive sales territory but, after he started, he was displeased to learn that several other Lawson agents would be working in the same sales territory. <u>Id.</u> at p. 7 of 65.

As a consequence, in February of 2003, Ross contacted Darryl Vidor ("Vidor"), who was a Vice President of Sales at Drummond, in order to inquire about a sales position at Drummond. <u>Id.</u> at p. 8 of 65. According to Ross, he was primarily attracted to the position at Drummond because he would have an exclusive sales territory, and because he would receive higher commissions. <u>Id.</u> at p. 13 of 65. According to Ross, Vidor interviewed him during a telephone conversation in early February of 2003. <u>Id.</u> at p. 15 of 65. During his deposition, Ross testified that his best

recollection was that he accepted an offer of employment with Drummond during that conversation with Vidor.  Id.

Ross further testified that, after this telephone conversation, he was presented with an "Agreement with Independent Sales Agent" ("the Agreement"), when it was either brought to his home, or mailed to him, by Vidor.  Id. at p. 16 of 65.  According to Ross, he did not recall Vidor telling him that he would be required to sign the Agreement prior to joining Drummond as a Sales Agent, when he was offered the position.  Id. at pp. 15-16 of 65.

Shortly thereafter, on February 15, 2003, Ross signed the Agreement, which had an effective date of February 17, 2003.  Id. at pp. 15-16, and 65, of 65, and Agreement with Independent Sales Agent at p 2 and 5 of 5.[1]  Id.  Although Ross did not recall on what date he started working, he testified that he had no reason to believe he started selling Drummond products before signing the Agreement, and he assumed he started working after signing the Agreement.  See, Ross Depo. at p. 16 of 65.  A Sales Report generated by Drummond represents that Ross started working on

---

[1]The Agreement provides that it was "made and entered into" on February 9, 2003."  See, Agreement With Independent Sales Agent, Docket No. 54-3, at p. 2, and 5, of 5.  Ross testified that Vidor filled in this date on the Agreement, because the date was not in his own handwriting, and because he actually signed the Agreement on February 15, 2003.  See, Ross Depo., at p. 15-16 and 65 of 65.

February 17, 2003, which was two (2) days after he signed the Agreement. See,

Docket No. 54-4, Exhibit D to Weiner Aff., at p. 1.

As pertinent here, the Agreement, which was signed by Ross, contains a non-

compete provision that provides as follows:

> AGENT hereby acknowledges, understands and agrees:
>
>       \*      \*      \*
>
> (d)     Accordingly, in consideration of [Drummond's] engaging him or continuing to engage him as an INDEPENDENT SALES AGENT under this Agreement, AGENT hereby agrees as follows:
>
> > (I)     During the term of his independent sales agency hereunder and for a period of two (2) years following termination thereof, whether by himself or by [Drummond], for whatever reason and whether for cause or without cause, AGENT shall not, directly or indirectly, for or on behalf of himself or any person, firm or entity solicit orders from or sell to any customer whom or which he solicited or sold on behalf of [Drummond] during the last twelve (12) months of his relationship with [Drummond], any products competitive to those distributed by [Drummond]. Products competitive to those distributed by [Drummond] are those which are substantially similar to or serve substantially similar functions as those products listed in [Drummond's] Sales Kit,

Catalogs and Manuals furnished to AGENT
from time to time.

Agreement With Independent Sales Agent at p. 3 of 5.

The Agreement also contained a merger clause, and provided that Ross's sales territory would not be exclusive. Id. at pp. 4-5 of 5.

Gawne attests that, following Ross's signing of the Agreement, and his engagement as a Sales Agent, Drummond provided Ross with access to its trade secrets, and its confidential and proprietary information, which included a sales kit, manual, catalogs, pricing information, and other proprietary information. See, Gawne Aff. at ¶¶8-9. Gawne further attests that, "in reliance upon Ross's contractual promises and confidentiality obligations, Drummond placed Ross in an important sales role for the Company * * * [in which he] routinely dealt with Drummond's customers and learned their buying history and preferences." Id. at ¶8. Ross testified that, during his time at Drummond, his sales continued to increase every year, and that he won sales awards for his performance. See, Ross Depo. at p. 39 of 65.

Towards the end of 2007, Ross became dissatisfied with his employment at Drummond, owing, at least in part, to the implementation of a program that impacted upon the exclusivity of his sales territory. See, Michael C. Ross Affidavit, ("Ross Aff."), Docket No.59, at ¶¶2-4. In this litigation, Ross claims that Drummond had

orally agreed that Ross would be provided an exclusive sales territory, and that Drummond breached that agreement when it permitted other Sales Agents to solicit customers in Ross's territory.

Thereafter, in May or June of 2008, Gary Olson ("Olson"), who was a former Drummond employee, called Ross to tell him that he had recently obtained a position with Share. See, <u>Ross Depo.</u> at p. 31 of 65. They discussed Share, although Ross could not recall the specifics of that conversation, and he acknowledged he was aware that Share sold a competitive line of chemical products. <u>Id.</u>

Then, in early July of 2008, Drummond asked all of its Sales Agents, including Ross, to sing a new Sales Agent Agreement, and they were told that, if they didn't sign it, they would be terminated. <u>Id.</u> at pp. 28-29 of 65; <u>Ross Aff.</u> at ¶7. The changes included, among other things, a waiver of the right to a Jury Trial; a forum selection clause which designated Cook County, Illinois, as the forum; and a reduction of the statute of limitations to six (6) months. <u>Id.</u>

In mid-July, Ross and Olson had another conversation, in which Ross requested information about Share, and expressed his interest in working there. <u>Ross Depo.</u> at pp. 29-30 of 65. John Wright ("Wright"), who is the Vice President of Share, subsequently interviewed Ross for a sales position with Share. See, <u>Wright Depo.</u> at

pp. 4, and13, of 18. Ross testified that he informed Wright that he intended to call on his former Drummond customers, and that Wright was aware that he would be doing so, after joining Share. See, Ross Depo at pp. 41-42 of 65. Ultimately, Wright offered Ross a sales position with Share. Ross testified that nobody ever told him, either before or after he accepted the position with Share, that he should not call on his former Drummond customers. Id. at p. 27 of 65.

In late July of 2008, after Ross had accepted Share's offer of employment, Ross again spoke with Olson, who suggested that, if Ross was going to leave Drummond, he "strongly suggested" that he submit a letter of resignation to Drummond. Id. at p. 33 of 65. Accordingly, on August 1, 2008, Ross submitted a resignation letter to Drummond, in which he stated that, "[a]fter careful consideration and evaluation of my business relationship with the organization, I am refusing to sign any new contracts or agreements and also have concerns that the organization has breached my previous agreement with the organization." Docket No. 54-6, Exhibit F to Weiner Aff.

Thereafter, on or about August 4, 2008, Ross began working for Share. See, Ross Depo. at p. 5 of 65. Ross testified that, upon being hired by Share, he was

presented with a new employee packet.  Id. at p. 45 of 65.  The packet included an

Acknowledgment, which stated as follows:

> I, Mike Ross, do hereby acknowledge and truthfully state that I was not solicited for employment by Share Corporation or any of its officers, agents, affiliates or person acting on their behalf.
>
> I, Mike Ross, do hereby agree that as an employee and/or agent of Share Corporation, its affiliates, and assigns I will not solicit, either directly or indirectly, the sale of chemical specialty products to my former customers (i.e., those sold by me on behalf of Drummond American during my last twelve (12) months of employment with Drummond American), for a period of twenty-four (24) months from the termination of my employment with Drummond American or from the last date I sold to my former customers, whichever date is later.

Docket No. 54-7, Exhibit G to Weiner Aff.; see also, Ross Depo. at p. 44 of 65.

Ross told Olson that he would not sign the Acknowledgment because he did not

believe that he was bound by his Agreement with Drummond.  See, Ross Depo. at pp.

44-45 of 65.  In response, Olson stated that it was up to Ross's discretion whether to

sign the Acknowledgment.  Id.  In the first month of his employment with Share, Ross

solicited sixteen (16) of his former Drummond accounts, and he sold Share products

that were similar to Drummond products, to at least twelve (12) of his former

Drummond accounts.  Id. at pp. 45-63 of 65.

Shortly after Ross joined Share, counsel for Drummond sent a cease and desist letter to Ross, which he shared with Wright. Id. at p. 64 of 65; see also, Docket No. 54-10, Exhibit J to Weiner Aff.. The letter reminded Ross of the terms of the Agreement he had signed with Drummond, and requested that he cease any activity that was inconsistent with the non-compete and non-solicitation provisions of the Agreement. Id. Neither Ross, nor Wright, took any action in response to that letter. See, Ross Depo. at p. 64 of 65; Exhibit E to Weiner Aff, supra at p. 15 of 18. Subsequently, on September 2, 2008, Drummond filed this lawsuit against the Defendants.

### III. Discussion

A. Standard of Review. Summary Judgment is not an acceptable means of resolving triable issues, nor is it a disfavored procedural shortcut when there are no issues which require the unique proficiencies of a Jury in weighing the evidence, and in rendering credibility determinations. See, Celotex Corp. v. Catrett, 477 U.S. 317, 327 (1986); Midwest Oilseeds, Inc. v. Limagrain Genetics Corp., 387 F.3d 705, 711 (8th Cir. 2004), cert. denied, 544 U.S. 977 (2005). Summary Judgment is appropriate when we have viewed the facts, and the inferences drawn from those facts, in a light most favorable to the nonmoving party, and we have found no triable issue. See, Eide

v. Grey Fox Technical Servs. Corp., 329 F.3d 600, 604 (8th Cir. 2003); Philip v. Ford Motor Co., 328 F.3d 1020, 1023 (8th Cir. 2003); United Fire & Casualty Co. v. Garvey, 328 F.3d 411, 413 (8th Cir. 2003).

For these purposes, a disputed fact is "material" if it must inevitably be resolved and the resolution will determine the outcome of the case, while a dispute is "genuine" if the evidence is such that a reasonable Jury could return a Verdict for the nonmoving party. See, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Planned Parenthood of Minnesota/ South Dakota v. Rounds, 372 F.3d 969, 972 (8th Cir. 2004); Fenney v. Dakota, Minnesota & Eastern R.R. Co., 327 F.3d 707, 711 (8th Cir. 2003).

As Rule 56(e)(2) makes clear, once the moving party files a properly supported Motion, the burden shifts to the nonmoving party to demonstrate the existence of a genuine dispute. In sustaining that burden, "an opposing party may not rely merely on allegations or denials in its own pleading; rather, its response must -- by affidavits or as otherwise provided in this rule -- set out specific facts showing a genuine issue for trial." Rule 56(e)(2), Federal Rules of Civil Procedure; see also, Anderson v. Liberty Lobby, Inc., supra at 256; Eddings v. City of Hot Springs, Ark., 323 F.3d 596, 602 (8th Cir. 2003).

Moreover, the movant is entitled to Summary Judgment where the nonmoving party has failed "to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, supra at 322; see also, Forest Park II v. Hadley, 408 F.3d 1052, 1057 (8th Cir. 2005); Mercer v. City of Cedar Rapids, 308 F.3d 840, 843 (8th Cir. 2002); Hammond v. Northland Counseling Center, Inc., 218 F.3d 886, 891 (8th Cir. 2000). No genuine issue of fact exists in such a case because "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Celotex Corp. v. Catrett, supra at 323; see also, Sallis v. University of Minnesota, 408 F.3d 470, 474 (8th Cir. 2005); Davis v. U.S. Bancorp, 383 F.3d 761, 768 (8th Cir. 2004); Bell Lumber and Pole Co. v. United States Fire Ins. Co., 60 F.3d 437, 441 (8th Cir. 1995).

B.     Legal Analysis.  Drummond asserts that there are no genuine issues of material fact on three (3) issues:  (1) that Ross's noncompetition Agreement with Drummond is enforceable; (2) that Ross breached the Agreement; and (3) that Share tortiously interfered with Drummond's Agreement with Ross.   Accordingly, Drummond seeks Summary Judgment on its claim for breach of contract against Ross, and on its claim for tortious interference with a contract against Share.  Applying

Minnesota law, we begin with the question of whether the restrictive covenants, which were contained in the Sales Agreement, are enforceable.

1.     Is the Noncompetition Agreement Enforceable? Since noncompete agreements are considered a partial restraint on trade, Minnesota Courts look upon noncompete agreements with disfavor and, as a consequence, they are cautiously considered and carefully scrutinized.  See, Kallock v. Medtronic, Inc., 573 N.W.2d 356, 361 (Minn. 1998); National Recruiters, Inc. v. Cashman, 323 N.W.2d 736, 740 (Minn. 1982); Freeman v. Duluth Clinic, Inc., 334 N.W.2d 626, 630 (Minn. 1983).

Generally, noncompetition "agreements are invalid unless bargained for and supported by adequate consideration." Sanborn Mfg. Co. v. Currie, 500 N.W.2d 161, 164 (Minn.App. 1993), National Recruiters, Inc. v. Cashman, supra at 740; Ikon Office Solutions, Inc. v. Dale, 170 F. Supp.2d 892, 896 (D. Minn. 2001), aff'd, 22 Fed.Appx. 647 (8th Cir. 2001).  Where the  noncompetition agreement is entered "at the inception of the employment relationship, no independent consideration is necessary to support the agreement." Overholt Crop Ins Service Co, Inc. v. Bredeson, 437 N.W.2d 698, 702 (Minn.App. 1989).  However, "[i]f the covenant is not made ancillary to the initial employment contract, it can be sustained only if it is supported by independent consideration." Freeman v. Duluth Clinic, Inc., supra at 630, citing

National Recruiters, Inc. v. Cashman, supra at 740; Sanborn Mfg. v. Currie, supra. "This requirement reflects the fact that employers and employees have unequal bargaining power." Id. at 164.

Drummond argues that the noncompete Agreement was ancillary to the initial employment contract, and accordingly, that it is supported by adequate consideration. The Defendants contend that there is evidence, in the Record, that Ross was not informed of the noncompetition Agreement until after he had already accepted the offer of employment, and consequently, the Defendants contend that there is a genuine issue of material fact, as to whether the noncompetition Agreement was ancillary to the initial offer of employment.

The Minnesota Courts have concluded that independent consideration is required where noncompete agreements are presented to employees after they have commenced their employment. See, e.g., National Recruiters, Inc. v. Cashman, supra at 740; Davies & Davies Agency, Inc. v Davies, 298 N.W.2d 127, 133 (Minn. 1980). In Davies & Davies Agency, Inc. v. Davies, supra at 132, the defendant was aware that he would be required to sign a noncompetition agreement, but he was not shown a copy of that agreement before he began working for the employer. Id. Eleven (11) days after his employment commenced, he was presented with, and asked to sign, a

noncompetition agreement, and for the first time, he was informed that he would be required to sign the agreement, or his employment would be terminated.  Id.  Although the defendant signed the agreement, he did so reluctantly.  Id.  The Minnesota Supreme Court concluded that the noncompetition agreement required independent consideration, which was not present on the facts, and therefore, the Court concluded that the agreement was unenforceable for lack of consideration.  Id.

Similarly, in National Recruiters, Inc. v. Cashman, supra, the Minnesota Supreme Court held that noncompetition agreements, which were signed by several employees after they had started their employment, were not ancillary to the initial employment agreement.  There, the employer interviewed several applicants and, during the interviews, the applicants were informed of the compensation and other benefits available through the position, but the applicants were not told that they would be required to sign a noncompetition agreement.  Id. at 738.  After reporting for work, they were presented with a noncompetition agreement, which they were required to sign.  Id.  The Court held that the noncompete was not a part of the original oral offer of employment, and therefore, the noncompetition agreements failed for lack consideration.  Id. at 740-741; see also, Freeman v. Duluth Clinic, Ltd.,

supra (covenant not to compete that was signed by physician several years after his original contract required independent consideration).

Here, the Record establishes that Ross signed the noncompetition agreement prior to his first day of work at Drummond. Nevertheless, Minnesota Courts have concluded that, "[w]hen the employer fails to inform prospective employees of noncompetition agreements **until after they have accepted jobs**, the employer 'takes undue advantage of the inequality between the parties." Sanborn Mfg Co. v. Currie, supra at 164 [emphasis added], quoting National Recruiters, Inc. v. Cashman, supra at 741; Midwest Sports Marketing, Inc. v. Hillerich & Bradsby of Canada, Ltd., 552 N.W.2d 254, 265 (Minn. App. 1996), rev. denied (Minn., September 20, 1996); Timm & Associates, Inc. v. Broad (Timm I), 2005 WL 3241832 at *2 (D. Minn., November 30, 2005)("A dispute regarding whether an employee received a non-competition agreement prior to accepting an offer of employment constitutes a disputed issue of material fact, and can preclude a showing of likelihood of success on the merits.").

In Sanborn Mfg Co. v. Currie, supra, the employer and the employee reached an agreement on the terms of employment, but the employer did not inform the employee that he would be required to sign a noncompetition agreement. Id. at 162. The employer also sent the employee a written offer of employment, which also did

not mention the noncompetition agreement.  Id.  The employee then accepted the offer, quit his job in North Carolina, signed a purchase agreement to sell his home, and then flew to Minnesota to fill out the employment paperwork, at which time, he was presented with the noncompetition agreement.  Id. at 162-163.  The Court concluded that the agreement was not a part of the initial employment contract, and accordingly, that the noncompete must be supported by independent consideration. Id. at 164.

Drummond contends that the present case is distinguishable from Sanborn, because Drummond did not mislead Ross, and because Ross did not take the same actions, in reliance on the employment offer, before being presented with the noncompetition agreement.  Of course, we do not dispute that the circumstances of this case are different than those in Sanborn.  However, the key element in the Court of Appeals' decision was the fact that an employment contract had already been formed, prior to the employee being asked to sign the noncompetition agreement. Notably, the Minnesota Court of Appeals rejected the employer's argument that, so long as the noncompetition agreement was executed before the employee began work, it did not have to be supported by independent consideration.  Id. at 164.  The Court of Appeals concluded that such an argument was not supported by the law, and

determined that the parties "had an oral employment agreement before they executed the noncompetition agreement, and thus independent consideration for the non-competition agreement was required." Id.

Moreover, consistent with the holding in Sanborn, Courts in this District have concluded, on a number of occasions, that the failure to disclose the noncompetition agreement prior to the employee's acceptance of an employment offer, is a primary consideration in determining whether independent consideration is required. See, Timm & Associates, Inc. v. Broad (Timm II), 2006 WL 3759753 at *2 (D. Minn., December 21, 2006)(concluding that, because the parties presented contradictory evidence as to whether the employee received the noncompetition agreement before or after he accepted the offer of employment, genuine issues of material fact remained); Universal Hospital Services, Inc. v. Henderson, 2002 WL 1023147 at *3 (D. Minn., May 20, 2002)("[The plaintiff] has the burden of proving that the Agreement was valid; at this stage, it has not met its burden because it has not refuted [the defendant's] assertion that he accepted the employment offer before [the plaintiff] asked him to sign the Agreement."); Cannon Services, Inc. v. Culhane, 2004 WL 950414 at *3 (D. Minn., April 30, 2004)(concluding that the "circumstances present a classic dispute of material fact," where the defendant asserted that no one ever

mentioned the noncompetition agreement prior to his accepting the offer, and where the plaintiff asserted that it had reminded the defendant repeatedly that he would be required to sign such an agreement); see also, National Recruiters, Inc. v. Cashman, supra at 741 ("The practice of not telling prospective employees all of the conditions of employment **until after the employees have accepted the job** * * * takes undue advantage of the inequality between the parties.")[emphasis added].[2]

Viewing the evidence in the light most favorable to the Defendants, as we must, we conclude that Drummond has not established that it informed Ross that he would be required to sign a noncompetition agreement before he accepted Drummond's offer of employment. During his deposition, Ross testified that, to his best recollection, he accepted the offer of employment during the phone interview with Vidor, and that the noncompetition Agreement was presented to him some time later -- either via mail, or by Vidor personally when he went to Ross's home. He

---

[2]We recognize that a number of the cases, on this particular issue, are procedurally distinguishable, as they were decided on a Motion for a Preliminary Injunction. See, e.g., Cannon Services, Inc. v. Culhane, 2004 WL 950414 (D. Minn., April 30, 2004). As a result, Drummond contends that those cases do not apply. See, Plaintiff's Reply, Docket No. 64, at p. 8. However, the cases provide helpful guidance on the facts that are appropriately considered by the Courts, in determining whether a noncompete agreement was supported by adequate consideration. Accordingly, while we recognize that the cases are not binding in any strict sense, we nevertheless find that they have persuasive value when addressing the matters now before this Court.

further testified that he did not recall Vidor telling him that he would be required to sign a noncompetition agreement, and Drummond has not offered any evidence that Vidor, or anyone else at Drummond, informed Ross of that requirement, before Ross accepted the employment offer.

Drummond also argues that, "after extensive discovery and numerous depositions, Defendants can point to no evidence that Ross was not fully informed about the non-solicitation provision at the inception of his agency relationship." See, Plaintiff's Reply, Docket No. 64, at pp. 8-9 of 10. However, as the Plaintiff, and the moving party, it is Drummond who must proffer evidence in support of the validity of the Agreement, and notably, Drummond has not provided any uncontroverted evidence that demonstrates that it advised Ross that he would be required to sign a noncompetition agreement prior to his acceptance of the employment offer. As a consequence, we conclude that genuine issues of material fact remain, since Drummond has failed to establish that the Agreement was ancillary to the initial employment agreement.

Drummond further argues that, even if the noncompetition agreement was received after Ross accepted the offer of employment, it is still enforceable because it was supported by independent consideration "in the form of an exclusive territory,

customer lists, and a promise of higher commissions." See, <u>Plaintiff's Memorandum in Support</u>, supra at p. 11 of 21. The Defendants respond that this is insufficient to establish independent consideration, because those incentives offered nothing beyond what was already promised in the initial employment agreement. See, <u>Defendants' Memorandum in Opposition, Docket No. 57</u>, at p. 10 n.1. Given the Record before us, we agree.

The adequacy of independent consideration, in an ongoing employment relationship, depends upon the facts of each case. See, <u>Davies & Davies Agency, Inc. v. Davies</u>, supra at 130. Minnesota Courts have held that, while "the mere continuation of employment can be used to uphold coercive agreements, * * * [the noncompetition agreement] must be bargained for and provide the employee with real advantages." <u>Freeman v. Duluth Clinic, Inc.</u>, supra at 630, citing <u>Davies & Davies Agency, Inc. v. Davies</u>, supra at 130-31; <u>Johnson v. Michigan Claim Service, Inc.</u>, 471 F. Supp.2d 967, 975 (D. Minn. 2007); <u>Satellite Industries, Inc. v. Keeling</u>, 396 N.W.2d 635, 639 (Minn.App. 1986), rev. denied (Minn., January 21, 1987); <u>Sanborn Mfg Co. v. Currie</u>, supra at 164.

Here, Drummond has failed to produce any evidence to support its contention that the benefits in question were tied to Ross's signing of the noncompetition

agreement, and Ross's testimony relates that the terms of employment were already agreed upon, prior to his being asked to sign the noncompetition agreement -- facts which Drummond has not competently contested.  See, <u>Sanborn Mfg Co. v. Currie</u>, supra at 164 (finding no independent consideration because there was no difference between what the employee was promised, in his initial employment agreement, and what he received in the course of his employment); <u>Ikon Office Solutions, Inc. v. Dale</u>, supra at 897 (The non-compete agreement failed for lack of consideration, because "[t]he record abundantly reflects that [the defendant] signed the agreement after accepting the employment offer and not as a separately bargained for condition of employment or in exchange for some additional employment benefit or advantage."); compare, <u>Cook Sign Co. v. Combs</u>, 2008 WL 3898267 at *6 (Minn. App., August 26, 2008)(finding independent consideration where "[t]he employment agreement clearly stated that in exchange for the $2,500.00 signing bonus and the income guarantee, appellant needed to sign a noncompete agreement."); <u>Guidant Sales Corp. v. Baer</u>, 2009 WL 490052 at *2-3 (D. Minn., February 26, 2009) (concluding that there was independent consideration for noncompetition agreement, which was signed in conjunction with the employee's promotion to a management position,

involving increased authority and responsibility, even though the employee lost income as a result of the promotion).

We recognize that Ross stayed with Drummond for more than five (5) years, and that he continued to increase his earnings during that period of employment. However, based upon the evidence in the Record, we find this case to be distinguishable from those cases in which the Courts have found that continued employment constituted adequate consideration. Compare, Davies & Davies Agency, Inc. v. Davies, supra (finding independent consideration where the employment continued for ten (10) years, and where he advanced within the agency, and took on increased responsibility, to a degree that otherwise would have been unavailable to him, as evidenced by the advancement of employees who did not sign noncompetition agreements); Satellite Industries, Inc. v. Keeling, supra at 639 (concluding that there was independent consideration where the defendant stayed with the employer for eleven (11) years, and "he steadily advanced through the company, eventually reaching the position of vice president of sales."); Timm & Associates, Inc. v. Broad (Timm II), supra at *2 ("The parties offer conflicting evidence as to whether [the defendant's] draw payments and training went 'beyond' the scope of the original

employment agreement," and accordingly, there remained a genuine issue of material fact, as to the enforceability of the non-competition agreement.).

On this Record, we find that, although Ross was successful in increasing his sales, there is no evidence that he advanced so as to take on additional responsibility or authority, or that the sales position that he held, and the benefits that he derived therefrom, were anything beyond what was agreed upon in the initial employment agreement. As such, we conclude that the ongoing employment relationship does not constitute independent consideration, under the circumstances presented here.

On a Motion for Summary Judgment, "[i]f reasonable minds could differ as to the import of the evidence, * * * Summary Judgment should not be granted and, in exercising its function, the Court is not to weigh the evidence." LensCrafters, Inc. v. Vision World, Inc., 943 F. Supp. 1481, 1487 (D. Minn. 1996), citing Anderson v. Liberty Lobby, Inc., supra at 250-51, and AgriStor Leasing v. Farrow, 826 F.2d 732, 734 (8th Cir. 1987)("The judge's function is not to weigh the evidence, but rather is to determine as a matter of law whether there are genuine factual conflicts," and "[i]n making this determination, the court is required to view the evidence in the light most favorable to the non-moving party and to give that party the benefit of all reasonable inferences to be drawn from the underlying facts.")[citations omitted]. Drawing all

reasonable inferences, and considering the evidence, in favor of the nonmoving parties -- here, the Defendants -- we find that, given Drummond's failure to proffer any evidence, that it offered any particular benefits to Ross for signing the noncompetition agreement, which were not already a part of the employment agreement, Drummond has failed to demonstrate that the noncompetition Agreement is enforceable, on the Record before us.

In sum, since Drummond has not demonstrated that the noncompetition Agreement is enforceable as a matter of law, it is not entitled to Summary Judgment on its breach of contract claim against Ross, or on its tortious interference claim against Share.[3] As we have detailed, we find genuine disputes of material fact, on the

---

[3]Under Minnesota law, a claim for tortious interference with a contractual relationship requires that the plaintiff show: "(1) the existence of a contract; (2) knowledge of the contract by the alleged wrongdoer; (3) intentional procurement of the contract's breach; (4) absence of justification; and (5) damages caused by the breach.'" Flora v. Firepond, Inc., 260 F. Supp.2d 780, 789 (D. Minn. 2003), aff'd sub nom., Syverson v. Firepond, 383 F.3d 745 (8th Cir. 2004), quoting Metge v. Central Neighborhood Improvement Association, 649 N.W.2d 488, 500 (Minn. App. 2002), review dismissed (Minn., October 15, 2002); Guinness Import Co. v. Mark VII Distributors, Inc., 971 F. Supp. 401, 412 (D. Minn. 1997), aff'd, 153 F.3d 607 (8th Cir. 1998); Kjesbo v. Ricks, 517 N.W.2d 585, 588 (Minn. 1994). As there are genuine issues of material fact that plague the existence of an enforceable contract, we cannot grant Drummond's Motion on that claim.

issue of consideration, and accordingly, on the enforceability of the Agreement, which precludes Summary Judgment on this Record.

NOW, THEREFORE, It is --

RECOMMENDED:

That the Plaintiff's Motion for Partial Summary Judgment [Docket No. 51] be denied.


Dated: July 23, 2010                          *s/Raymond L. Erickson*
                                              Raymond L. Erickson
                                              CHIEF U.S. MAGISTRATE JUDGE


**NOTICE**

Pursuant to Rule 6(a), Federal Rules of Civil Procedure, D. Minn. LR1.1(f), and D. Minn. LR72.2(b), any party may object to this Report and Recommendation by filing with the Clerk of Court, and by serving upon all parties **by no later than August 6, 2010**, a writing which specifically identifies those portions of the Report to which objections are made and the bases of those objections. Failure to comply with this procedure shall operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals.

If the consideration of the objections requires a review of a transcript of a Hearing, then the party making the objections shall timely order and file a complete transcript of that Hearing by no later than **August 6, 2010**, unless all interested parties stipulate that the District Court is not required by Title 28 U.S.C. §636 to review the transcript in order to resolve all of the objections made.